**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CAROL GRAHAM,                     )<br>                                                    )<br>                    **Plaintiff,**         )<br>                                                    )         **CIVIL ACTION**<br>v.                                               )<br>                                                    )         **No. 13-1400-KHV**<br>CAROLYN W. COLVIN,            )<br>Acting Commissioner of Social Security,  )<br>                                                    )<br>                    **Defendant.**        )<br>_____) | |

**MEMORANDUM AND ORDER**

Carol Graham appeals the final decision of the Commissioner of Social Security to deny disability insurance benefits and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434, 1281-1385. For reasons set forth below, the Court finds that the final decision of the Commissioner should be affirmed.

**I.    Procedural Background**

Plaintiff was born on September 30, 1964. On May 25, 2011, plaintiff applied for disability insurance benefits alleging a period of disability beginning June 30, 2010. Plaintiff alleged disability due to prolapsed colon and rectum, pancreatic problems, fibromyalgia, depression, back injury, asthma, chronic obstructive pulmonary disorder, arthritis, neck injury and anxiety. Tr. 268. The agency denied plaintiff's application initially and upon reconsideration. On June 7, 2013, following a hearing, an administrative law judge ("ALJ") found that plaintiff was not disabled as defined in the Social Security Act. On August 30, 2013, the Appeals Council denied plaintiff's request for review. The ALJ decision thus stands as the final decision of the Commissioner. Plaintiff appealed to this Court the final decision of the Commissioner.

## II. Facts

The following is a summary of the evidence presented to the ALJ.

### A. Medical Evidence

Beginning in January of 2008, Graham sought treatment at the Greeley/Wallace County Family Practice Center for recurrent bouts of pneumonia, back and shoulder pain, neurotic depression, anxiety and other medical issues. Over the next few years, Dr. Robert P. Moser, M.D., Physician's Assistant Kimberly Dansel and Nurse Practitioners Kathryn Bangerter and Eldonna Sylvia treated Graham. These health professionals prescribed various combinations of drugs – including Neurontin, Celebrex, Cymbalta, Ultracet, Lortab, Mobic and Buspar – to address plaintiff's pain, respiratory symptoms, depression, anxiety and sleep issues.

On September 16, 2008, Graham reported continued pain in her back and upper extremity joints. Dansel assessed 18 out of 18 positive fibromyalgia trigger points and recommended an evaluation to rule out rheumatoid arthritis. On September 23, 2008, Dansel diagnosed Graham with fibromyalgia, low back pain, depression and anxiety syndrome and prescribed Neurontin. Tr. 454. On October 6, 2008, Graham requested stronger medication for back pain. Dansel increased the Lortab dosage and prescribed Norflex for muscle spasm. Tr. 452, 476. Graham's depression and anxiety appeared to worsen. On October 30, 2008, Graham reported that she had lost her job, and complained of panic attacks four or five times a day. Dansel prescribed Xanax and increased the Buspar dosage. She also recommended that Graham seek mental health counseling. Tr. 449-50.

On November 7, 2008, Dr. Randy Fahrenholtz saw Graham and diagnosed panic disorder, anxiety and depression. He discontinued Xanax and started Graham on Lorazepam. Tr. 447.

On December 8, 2008, Dansel noted that Graham was taking too much Lorazepam, and

directed her to reduce her use. On January 6, 2009, Graham reported that she was feeling worse overall and was taking more Lortab than she should for back pain. Dansel noted that plaintiff had normal gait, and questioned whether plaintiff was malingering. Later that month, Graham received a steroid injection and was hospitalized for pneumonia.

On February 17, 2009, Graham reported that she was not using Lorazepam and was having more anxiety attacks. Tr. 433. On February 23, 2009, Dansel prescribed Lorazepam and antibiotics for bronchitis. Tr. 432.

From March through June of 2009, Graham received treatment for back pain and pneumonia. Tr. 422-27. On June 25, 2009, Graham reported that she fell and hurt her back and arm. Dansel prescribed Valium and Flexeril for spasms. Tr. 420. On July 6, 2009, Graham reported that her medications were not adequate, and that she had generalized pain and worsening back pain. The attending nurse recommended physical therapy. Tr. 419. On July 14, 2009, Dansel increased Celebrex and prescribed Lortab. Tr. 418. In August of 2009, Dansel declined plaintiff's request for narcotic pain medication.

In September of 2009, Graham reported lower back pain that made it hard to walk or bend. The attending nurse recommended tobacco cessation and low back stretching exercises. A month later, Graham reported pain and a grinding sensation in her right shoulder. Tr. 403. On November 9, 2009, an MRI of Graham's shoulder revealed severe osteoarthritic changes, rotator cuff tendinitis and a possible bone bruise. Tr. 502.

On December 3, 2009, Dansel prescribed Lortab for shoulder and leg pain, with no refill. On January 21, 2009, Dansel refused Graham's request for a Lortab refill. Graham continued to report shoulder pain, which increased with repetitive mopping and sweeping performed at work.

On March 22, 2010, Dansel gave Graham an injection for shoulder pain and prescribed Lortab for pain and Xanax for panic and anxiety episodes. Tr. 391.

On March 29, 2010, Graham asked for an increase in pain medication. Dansel prescribed Lortab, but noted that "THIS IS HER LAST REFILL!!" Tr. 390. Dansel refused to prescribe any more Xanax, noting that although Graham was to take it twice a day, she had used 20 in seven days. Instead, Dansel presribed Vistaril and Buspar for anxiety.

On November 22, 2010, Dansel administered an injection for shoulder pain. Tr. 384. On November 30, 2010, Graham reported that her regular pain medications were not working. Dansel gave her a Flector patch for shoulder and low back pain and started prescriptions for bronchitis, muscle spasms and back and shoulder pain. Tr. 383. Dansel noted that Graham should avoid controlled substances due to her history of overusing them.

On January 17, 2011, Graham reported increased back pain since starting a new job. Dansel prescribed Toradol for pain, and recommended that Graham see a pain specialist. Tr. 379. Graham also continued to struggle with depression and anxiety; on March 7, Dansel prescribed Ambien for sleep problems.

On March 7, 2011, Graham reported anxiety attacks and difficulty sleeping that did not improve with sleep aides. Tr. 374. On March 24, 2011, Dansel gave Graham samples of Seroquel to address anxiety and prescribed hydrocodone for abdominal pain. Tr. 373. On March 31, 2011, Graham reported anxiety attacks and pain with breathing. Dansel prescribed Toradol and Phenergan and applied for financial assistance to provide Seroquel. Tr. 372.

On April 4, 2011, Graham told Dansel that she had rolled her ankle and landed on her back, and requested a narcotic shot. Tr. 371, 874. Graham "groan[ed] in pain" and insisted that it was

"too painful to bear weight" on her left ankle. Dansel's examination, however, revealed no swelling. Graham could not pinpoint the source of the pain; she generalized that it was "the whole ankle." Tr. 371. An X-ray showed mild arthritic change but no acute fracture. Dansel questioned whether plaintiff was malingering and refused her request for a narcotic shot.

On June 16, 2011, Graham entered the hospital with pneumonia, bronchitis, chronic obstructive pulmonary disease ("COPD") and emphysema. Tr. 532. On June 18, 2011, she returned home. On June 24, 2011, Graham reported that she was trying to cut down on her smoking. Dansel gave Graham a steroid injection and one refill of Xanax for stress. Tr. 527.

On August 19, 2011, Graham had surgery to repair a rectal prolapse. Tr. 564-70. She returned home on August 24.

On September 21, 2011, Dr. Michael Schwartz, Ph.D. evaluated Graham for Disability Determination Services. Graham reported that if she took her time, she could perform activities of daily living including simple cooking. Dr. Schwartz noted that Graham had difficulty arising and walked with a wobbly, unstable gait. Graham stated that even with medications she did not sleep well, and that she had panic attacks every day. She reported that she was physically and sexually abused as a child and as an adult. Graham told Dr. Schwartz that she was afraid to leave the house and that she had nightmares, night sweats and flashbacks. Tr. 582-83.

Dr. Schwartz did not detect any cognitive or memory problems. He opined that Graham had severe psychiatric symptoms which would make it very difficult for her to function in a competitive work environment. He diagnosed Graham with chronic, severe post-traumatic stress disorder ("PTSD") and generalized anxiety disorder. He assessed a GAF score of 45. Tr. 584.

On September 19, 2011, Dansel saw Graham and noted that she had pain from her surgical

incision and also symptoms of withdrawal from narcotics dependence. Dansel referred Graham to Dr. Charles Frankum for a follow-up on the surgery. On October 26, 2011, Dr. Frankum released Graham to return to work and found that the surgery incisions were well healed.

On October 5, 2011, Dr. Fahrenholtz saw Graham regarding narcotic dependence. She reported that she took hydrocodone three times daily but that it did not control her pain. Dr. Fahrenholtz prescribed Percocet with the goal of discontinuing it over the next six weeks. Tr. 595. On October 19, 2011, Graham told Dr. Fahrenholtz that she had taken all of the prescribed Percocet over the past two weeks. She complained of a "laundry list" of generalized pain "all over," plus pain in her abdomen. Tr. 592. Dr. Fahrenholtz spoke with Dr. Frankum, who told him that Graham had no need for ongoing narcotic pain medication. Graham agreed to begin weaning off of narcotics over the next two weeks. On October 26, 2011, Graham complained of abdominal pain but the treatment notes stated: "no further narcotics." Tr. 590.

On November 16, 2011, Graham sought treatment for anxiety, and reported that her father had metastatic cancer. Dr. Fahrenholtz increased her dosage of Cymbalta. Tr. 639. After her father died, Graham returned to see Dr. Fahrenholtz with concerns about recent panic attacks and significant pain in her shoulders. Dr. Fahrenholtz recommended that Graham see an orthopedist. Tr. 640. On January 14, 2012, Graham reported continued breakthrough anxiety, even with medication. Tr. 655.

On January 12, 2012, State Agency consultant Carol L. Adams, Psy.D. reviewed plaintiff's records at the request of the State Agency. She opined Graham had a severe mental impairment of anxiety disorder. Tr. 84. Dr. Adams opined that Graham had mild limitations in activities of daily living, moderate limitations in maintaining social functioning, moderate limitations in

concentration, persistence, and pace and no episodes of decompensation. Specifically, Dr. Adams opined that Graham could perform simple and intermediate level tasks with adequate concentration over a normal workweek and would have difficulty working closely with the public, but could interact appropriately with supervisors and coworkers. Tr. 89.

On February 22, 2012, Graham reported exacerbation of chronic pain and requested pain medication. When Dr. Farenholtz declined to prescribe narcotics, Graham complained that he would not "do anything" for her. Dr. Farenholtz noted that she had a "history of drug seeking behavior and escalation of dosing." Tr. 724, 848. Graham agreed to try physical therapy. Tr. 726.

On April 27, 2012, Graham reported pain in her neck and back, and Dr. Fahrenholtz noted limited range of motion in the neck. He also found tender points in all four quadrants consistent with ongoing fibromyalgia. Graham reported anxiety, depression, sinus pressure with frontal headache and fatigue. Tr. 727.

On May 8, 2012, Graham began mental health treatment with the Area Mental Health Center. Tr. 678. On May 17, 2012, Laura Fisher, MSW, LSCSW noted that Graham came to the session tired and drowsy did not seem to recall details of their previous session. Graham reported continued frustration with her pain and primary care doctor as well as her lack of insurance. Fisher worked with her on ways to manage her pain and depression. Graham continued treatment at the Mental Health Center in June and July of 2012.

On July 24, 2012, State Agency consultant, Dr. Geis, M.D. reviewed the record and opined that plaintiff had the following limitations.

- Lift 20 pounds occasionally and 10 pounds frequently;
- Stand and/or walk about six hours in an eight-hour workday with normal breaks;
- Sit about six hours in an eight-hour workday with normal breaks;

> • Avoid concentrated exposure to extreme cold, humidity, and fumes, odors, dusts, gases, poor ventilation, etc.

Tr. 122-24.

On October 14, 2012, an MRI of Graham's spine revealed small broad based disc bulges at T11-T12, L1-L2 and L2-L4 and spinal cord compression at C4-C5 secondary to moderate disc protrusion at C4-C5. The MRI of the right shoulder showed moderately severe osteoarthritis of the left shoulder and a tear at the articular surface of the supraspinatus tendon. Tr. 756-58. Dr. Vivek Sharma diagnosed cervical spine stenosis at C4-C5.[1] Tr. 815.

On January 29, 2013, Dr. Sharma completed a medical source statement. Dr. Sharma opined that Graham could lift, carry, push or pull less than five pounds frequently and ten pounds occasionally Tr. 915. Dr. Sharma further opined that Graham should never climb; could occasionally stoop, kneel, crouch and crawl; and could frequently balance, reach, handle, finger, feel and see. Dr. Sharma opined that Graham should avoid any exposure to heights and concentrated exposure to vibration. Tr. 916. In the section on ability to sit, stand and walk, Dr. Sharma did not mark any limitation. Rather, Dr. Sharma wrote "as per [patient] tolerance" in the margin next to each question in that section. Tr. 915.

B.   Plaintiff's Testimony

Plaintiff testified that pain and panic attacks keep her from being able to work. Tr. 41, 46. Her whole body aches, particularly her neck, but also her back, feet, arms and shoulders. Medications help, but she still has pain, which the cold makes worse. She also has breathing

---

[1]   A computerized tomography ("CT") scan on November 17, 2012 also revealed congenital interbody fusion at C5-C6 and moderate central canal stenosis at C3-C4 and C4-C5. Tr. 816.

problems and severe allergies. Tr. 48-49. She worries a lot, and sometimes stays on the couch for two to three days, only getting up to go to the bathroom. Tr. 45. She has trouble dealing with people in public. Tr. 51.

### C. Vocational Expert Testimony

The ALJ proposed the following hypothetical individual to the vocational expert:

- Light exertional level;
- Avoid concentrated exposure to extreme cold, humidity, fumes, dust, poor ventilation;
- Occasionally climb ramps and stairs, but should avoid climbing of ladders, ropes and scaffolds; and
- Simple and intermediate tasks with no more than occasional interaction with the general public.

Tr. 59. The vocational expert testified that such an individual could perform Graham's past relevant work as a housekeeper or laundry aide or could perform work as a sub-assembler of electrical equipment, collator operator or marker.

The ALJ then proposed a second hypothetical with the additional limitations of occasional stoop, kneel, crouch and crawl; should avoid unprotected heights and hazards as well as concentrated exposure to vibration; and could occasionally reach overhead with the right upper extremity. The vocational expert testified that an individual with such limitations could perform the same jobs as the first hypothetical individual. Tr. 60.

The ALJ then proposed a third hypothetical with the addition of a sit/stand option. The vocational expert testified that an individual with such limitations could perform work as a sub-assembler, marker and office helper. Tr. 60.

The ALJ proposed a fourth hypothetical, identical to the third but with the added limitation of being off of work a minimum of 25 per cent of the day due to pain. The vocational expert testified that there would be no work available for such an individual. Tr. 61. The vocational

expert also testified, in response to a question from Graham's attorney, that if the individual needed to alternate sitting and standing every 10-15 minutes, no work would be available.

### III.   ALJ Findings

In her order of June 7, 2013, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2. The claimant has not engaged in substantial gainful activity since June 30, 2010, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: Degenerative Disc Disease, Osteoarthritis of the Right Shoulder, Chronic Obstructive Pulmonary Disease, Anxiety Disorder, and Affective Disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant is able to lift or carry up to twenty pounds occasionally and ten pounds frequently. The claimant is able to stand or walk six hours out of an eight-hour workday and sit six hours out of an eight hour workday. She is able to occasionally climb stairs or ramps, but must avoid climbing ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to extreme cold, humidity, fumes, dust, poor ventilation, and vibration. She must avoid exposure to unprotected heights and hazards. The claimant is able to occasionally reach overhead with her right upper extremity. She can perform simple and intermediate tasks that do not require more than occasional interaction with the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 30, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as define in the Social Security Act, from June 30, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV.     **Standard Of Review**

The Court reviews the Commissioner's decision to determine whether it is "free from legal error and supported by substantial evidence." Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009); see 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Wall, 561 F.3d at 1052; Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires "more than a scintilla, but less than a preponderance." Wall, 561 F.3d at 1052; Lax, 489 F.3d at 1084. Whether the Commissioner's decision is supported by substantial evidence is based on the record taken as a whole. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994). Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion." Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005). To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will meticulously examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

Plaintiff bears the burden of proving disability under the Social Security Act. Wall, 561 F.3d at 1062. Plaintiff is under a disability if she can establish that she has a physical or mental impairment which prevents her from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least 12 months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)).

The Commissioner uses a five-step sequential process to evaluate disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). In the first three steps, the Commissioner determines (1) whether claimant has engaged in substantial gainful activity since the alleged onset, (2) whether she has a severe impairment or combination of impairments and (3) whether the severity of any impairment is equivalent to one of the listed impairments that are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(c), (d); see Williams, 844 F.2d at 750-51. If claimant satisfies steps one, two and three, she will automatically be found disabled. If claimant satisfies steps one and two but not three, the analysis proceeds to step four.

At step four, the ALJ makes specific findings of fact at three phases: (1) the individual's RFC, (2) the physical and mental demands of prior jobs or occupations and (3) the ability of the individual to return to the past occupation given her RFC. Winfrey v. Chater, 92 F.3d 1017, 1023-25 (10th Cir. 1996). If the claimant satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. Jensen v. Barnhart, 436 F.3d 1163, 1168 (10th Cir. 2005); see 20 C.F.R. § 404.1520(a)(5).

**V.    Analysis**

Plaintiff claims that the ALJ erred in formulating her RFC because she (1) did not provide

an adequate narrative statement and (2) erred in evaluating plaintiff's credibility.

### A. Narrative Statement To Support RFC

Plaintiff claims that the ALJ did not address her ability to sit, stand and walk throughout an eight-hour day and therefore did not provide an adequate narrative discussion of the RFC under SSR 96-8p.

Under SSR 96-8p, the narrative discussion must cite specific medical facts and nonmedical evidence to describe how the evidence supports each conclusion, discuss how plaintiff is able to perform sustained work activities, and describe the maximum amount of each work activity that plaintiff can perform. West's Soc. Sec. Reporting Serv., Rulings 149 (Supp. 2012). The discussion must explain how the ALJ considered and resolved any ambiguities and material inconsistencies in the evidence. Id. The narrative discussion must consider the credibility of plaintiff's allegations of symptoms and the medical opinions regarding plaintiff's capabilities. Id. at 149-50. If the ALJ RFC assessment conflicts with a medical source opinion, the ALJ must explain why she did not adopt the opinion. Id. at 150.

Here, plaintiff asserts that the ALJ did not discuss the medical evidence or plaintiff's allegations regarding her ability to sit, stand and walk throughout an eight-hour work day. Plaintiff's Brief (Doc. #11) filed March 3, 2014 at 15.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). If the Commissioner finds that a treating source opinion on the nature and severity of claimant's impairments is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record, the Commissioner will give it controlling weight. See 20 C.F.R. §§ 404.1527(c)(2). If the opinion is well supported, the ALJ must confirm that the opinion is consistent with other "substantial evidence" in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). "If the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Where, as here, the ALJ decides not to give controlling weight to a treating physician opinion, the ALJ must decide what weight to assign it. Newbold v. Colvin, 718 F.3d 1257, 1265 (10th Cir. 2013). Even if an opinion is not entitled to controlling weight, the ALJ must still weigh the opinion in light of the factors set forth at 20 C.F.R. § 404.1527. Id. Those factors are: (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ attention which tend to support or contradict the opinion. Watkins, 350 F.3d at 1301; 20 C.F.R. §§ 404.1527(c)(2-6), 416.927(c)(2-6).

After considering the factors, the ALJ must give reasons for the weight which she gives the treating source opinion. Watkins, 350 F.3d at 1301. Finally, if the ALJ rejects the opinion completely, the ALJ must then give "specific, legitimate reasons" for doing so. Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1996) (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

Here, on the medical source statement, Dr. Sharma marked limitations including that

-14-

plaintiff not lift more than ten pounds and minimize postural activities like climbing and stooping. Tr. 915-16. In the section on ability to sit, stand, and walk, however, Dr. Sharma did not mark any specific limitation; she wrote "as per [patient] tolerance" in the margin next to each question in that section. Tr. 915.

In determining plaintiff's RFC, the ALJ stated that she gave "some weight" to Dr. Sharma's opinion, assigned "great weight" to the postural limitations but stated that she was not persuaded by the lifting limitations. The ALJ did not address Dr. Sharma's notation that plaintiff could stand, walk and sit "as per [plaintiff's] tolerance." The ALJ also did not address the function report on which plaintiff stated that she could not stand or sit for long due to her impairments. Tr. 254. Further, the ALJ did not address why she chose not to incorporate any sit/stand option. Plaintiff asserts that the ALJ failure to do so requires remand. See Johnson v. Astrue, No. 2147-SAC, 2013 WL 557100, at *3-4 (D. Kan. Feb. 13, 2013) (remanding where ALJ assessed RFC that incorporated some but not all treating physician limitations; ALJ did not cite medical opinion that contradicted opinions of treating physician which ALJ did not include in RFC findings).

Plaintiff asserts that the record supports Dr. Sharma's opinion that her ability to stand, walk or sit was based on "claimant's tolerance." Plaintiff then points to her testimony that she could not sit or stand for long, and to medical records which indicate that she had spinal disc bulges and protrusions, complained of back and joint pain and consistently took prescription pain medication. Plaintiff argues that "[t]he ALJ's failure to adequately address the sit and/or stand was erroneous and that a sit and/or stand option "per claimant's tolerance" would result in a finding of disabled. Doc. #11 at 18.

Plaintiff assumes that Dr. Sharma's notation of "as per patient tolerance" imposed a

-15-

limitation of a sit/stand option. Plaintiff's Brief (Doc. #11) at 16, 18. The Commissioner asserts that Dr. Sharma did not provide an opinion whether plaintiff required a sit/stand option.[2] See Tr. 915-16. Rather, the Commissioner argues that "a better reading, and the one tacitly adopted by the ALJ, was simply [that] Dr. Sharma did not have an opinion regarding [p]laintiff's ability to sit and stand." Brief Of The Commissioner (Doc. #16) filed May 30, 2014 at 5 (citing Tr. 19), and thus the ALJ properly did not address a sitting/standing/walking limitation.[3]

Plaintiff does not cite any opinion, comment or treatment notes from Dr. Sharma or any other medical source which suggest that plaintiff required a sit/stand option. The Commissioner correctly points out that no clinical evidence suggests that plaintiff's doctors noticed that she had

---

[2] The ALJ discussed the portions of Dr. Sharma's medical source statement which actually offered an opinion. The ALJ explained that she assigned considerable weight to Dr. Sharma's opinion regarding postural restrictions, but rejected Dr. Sharma's opinion regarding plaintiff's ability to lift. Tr. 19. See Jones v. Astrue, 500 F. Supp. 2d 1277, 1285 (D. Kan. 2007) (ALJ explained why he discounted most of treating doctor's opinion and why he accepted portion of that opinion, and supported his explanation with evidence); 20 C.F.R § 404.1527(c)(2) (2013) (if treating opinion not well supported and not due controlling weight, ALJ considers appropriate weight based on treatment relationship, consistency with other evidence, extent to which doctor supported opinion); see also Oldham v. Astrue, 509 F.3d 1254, 1257-58 (10th Cir. 2007) (ALJ properly rejected treating physician opinions because they "did not have the opportunity to see or did not give weight to contrary evidence showing [claimaint's] greater functional capacity."). The ALJ noted that Dr. Sharma's opinion regarding postural movements was consistent with the remainder of the record, but that Dr. Sharma's opinion regarding lifting was not supported by plaintiff's expected improvement with treatment. Tr. 19. Plaintiff testified that she was limited to lifting about 15 pounds immediately after she had rectal surgery in August of 2011, but admitted that she was better after surgery, and that she had not gone back to see the doctor who had given her that limitation. Tr. 47-48, 564-65. The ALJ pointed to clinical evidence that plaintiff did not have any deficits in strength, and that her sensation was intact. Tr. 17, 656, 716.

[3] The ALJ cited clinical reports and medical opinion evidence from agency non-examining doctors regarding plaintiff's ability to walk. Tr. 17-20. Moreover, plaintiff testified that her doctors had instructed her to walk for exercise. Tr. 53. In February of 2011, at her well-woman examination, plaintiff displayed normal motor strength and normal gait and station. Tr. 17, 375, 716, 881. In January of 2012, she had a mild antalgic gait on the left, but she was able to bear weight normally, had normal reflexes and negative straight leg raise. Tr. 17, 656, 854.

any difficulty sitting or standing.

The ALJ's common-sense interpretation of the evidence was reasonable and well supported. See Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012) (ALJ need not discuss every piece of evidence; "common sense, not technical perfection," must be court's guide). On review, the Court assesses whether the ALJ gave "good reasons" to explain her ultimate decision, with sufficient reasoning to make the rationale of the decision clear. See Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003) (noting two-part analysis, and concluding the ALJ must "give good reasons in the notice of determination or decision for the weight assigned to a treating physician's opinion"); Newbold v. Colvin, 718 F.3d 1257, 1266 (10th Cir. 2013). Here, the Court finds that the ALJ's treatment of Dr. Sharma's opinion was supported by substantial evidence.

### B.    Credibility Regarding Complaints Of Pain

Plaintiff asserts that the ALJ failed to properly evaluate the credibility of her assertions of limitations caused by subjective complaints of pain.

An ALJ's credibility determinations are generally treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990). Credibility determinations are peculiarly the province of the finder of fact and will not be overturned when supported by substantial evidence. Wilson v. Astrue, 602 F.3d 1136, 1144-46 (10th Cir. 2010). Therefore, in reviewing the ALJ credibility determinations, the Court will usually defer to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994).

The Tenth Circuit has explained the analysis for considering subjective testimony regarding symptoms, as follows:

> A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the

>claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain. This court has stated: The framework for the proper analysis of Claimant's evidence of pain is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). We must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.

Thompson v. Sullivan, 987 F.2d 1482, 1488 (1993) (dealing specifically with pain) (further citations and quotation omitted).

For evaluating symptoms at step three of the framework, courts have set out a non-exhaustive list of factors which include the following:

>the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489); see Luna, 834 F.2d at 165-66; see also 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, the ALJ set out the Luna framework and found that plaintiff's medically determinable impairments of degenerative disc disease and osteoarthritis of the right shoulder could reasonably be expected to cause pain.[4] See Tr. 17-18. The ALJ then found that to the extent that they were inconsistent with the RFC assessment, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible. The ALJ found that plaintiff's allegations of pain were inconsistent with her reported activities of daily living. The ALJ noted that although

---

[4] As noted, plaintiff also asserted that she also had a severe impairment of fibromyalgia but the ALJ found that it was non-severe. Plaintiff does not contest this finding.

plaintiff testified that for a few days each week, she does not want to get up, she is able to maintain her small house, perform house work, prepare meals and babysit her grandchildren occasionally. The ALJ noted that plaintiff made trips to Oklahoma to settle her father's affairs, and that she spent three weeks caring for her grandchild with Down's syndrome while her daughter had surgery. The ALJ found that these activities "do not bolster the credibility of [plaintiff's] allegations of pain." Tr. 19.  The ALJ considered objective medical evidence, including records that plaintiff has received injections for pain in her shoulder.  The ALJ also noted that the record indicates drug seeking behavior and overuse of medication, however, and found that this factor "does not enhance the credibility of the claimant's allegations." Tr. 19.  The Court finds no basis to discount the ALJ's credibility determination.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C § 405(g) **AFFIRMING** the Commissioner's decision.

Dated this 8th day of September, 2015, at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge
